DECISION
Appellant, Lisa Ramey, appeals from the October 9, 2001 judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, adopting and approving the April 10, 2001 findings of fact and conclusions of law of the magistrate. For the following reason, we affirm the judgment of the trial court.
Cody Bradford was born on October 29, 1995 to Peggy Leslie[1] and Thomas Bradford. Cody resided with appellant when he was 18 months old. Appellant received legal custody of Cody in Montgomery County, Dayton, Ohio.
On September 30, 1999, Franklin County Children Services ("FCCS") filed a complaint alleging that Cody was a neglected and dependent child. The complaint alleged that Cody had special needs and behavioral issues that required a great deal of time and attention. FCCS alleged that Cody exhibited numerous unexplained bruises and injuries. The complaint further alleged that appellant relinquished her desire to further care for Cody.
A hearing was held on October 4, 1999. After the hearing, the magistrate ordered FCCS to maintain temporary custody of Cody, ordered psychological evaluations to be performed for both appellant and Cody, and ordered visitation with appellant for two hours each week. On October 6, 1999, appellant filed an objection to the magistrate's decision.
On December 6, 1999, the magistrate held an additional hearing on FCCS' initial complaint. The magistrate found that Cody's continued placement in appellant's home was contrary to his welfare. The magistrate dismissed FCCS' neglect cause of action and found Cody to be a dependent child. Cody became a ward of the court and was committed to the temporary custody of FCCS.
Later, appellant expressed her desire to be reunited with Cody. On or about March 30, 2000, after time spent in placement, Cody was returned to appellant, with FCCS to remain involved on a protective supervision basis.
On or about August 10, 2000 (approximately four to five months after Cody was returned to appellant) appellant was scheduled to undergo surgery, which required a two-month recovery period. Appellant sought "temporary placement" for no more than two weeks for her three youngest children, Daniel, Hunter,[2] and Cody. Appellant placed Daniel with family friends, Rich and Sharon Sue Westfall. Appellant had been acquaintances with Mrs. Westfall for 15 years. Sharon Gautier, appellant's cousin by marriage, agreed to take Hunter. Gautier was unable to take Cody. As a result, appellant then began to search for an alternative placement for Cody. Due to Cody's asthma, appellant wanted to find the appropriate placement for Cody in a smoke-free environment.
Appellant sought the help of her friend, Mrs. Westfall. Mrs. Westfall suggested to appellant that Mrs. Westfall's co-worker, Ron Meade, and his wife, Dorothy, would be willing to take Cody. Appellant testified that she asked the Meades to care for Cody while she had to undergo surgery. (Feb. 21, 2001 Tr. at 22-23.) The Meades agreed to take Cody while appellant was in the hospital. Appellant admitted that, based on Mrs. Westfall's word, she made arrangements for Cody to stay with total strangers. (Feb. 21, 2001 Tr. at 23.) Appellant at no time made an attempt to contact FCCS of her plan to temporarily place Cody with the Meades.
A month or so before her surgery, appellant arranged for Cody and the Meades to meet. Mrs. Westfall told appellant that the Meades were having a backyard barbecue, and that she would take Cody over to the Meades for their first initial meeting. On or about July 14, 2000, Cody met the Meades.
The following weekend, on or about July 21, 2000, appellant made arrangements with the Meades for Cody to spend the weekend with them. Appellant testified that she met Mrs. Meade at a White Castle restaurant. Appellant testified that because she had never met the Meades before, she requested that Mrs. Meade show appellant her I.D. in order for appellant to verify Mrs. Meade was who she said she was. (Feb. 21 2001 Tr. at 47.) Appellant testified that Mrs. Meade told her she would return Cody the next day. (Feb. 21, 2001 Tr. at 47.) At that meeting, appellant testified that Mrs. Meade gave appellant the Meade's home telephone number, Mr. Meade's cell phone number and their respective work telephone numbers. (Feb. 21, 2001 Tr. at 47-48.) Appellant further testified that she neither had the Meade's home address, nor personally knew of the living conditions at their home. (Feb. 21, 2001 Tr. at 81.)
Mr. Meade, however, gave a different account of the Meades' second encounter with Cody. Mr. Meade testified the he picked Cody up from appellant's home on a Friday night after work and returned Cody on that Sunday. (Feb. 27, 2001 Tr. at 102.) Mr. Meade testified that, when he returned Cody to appellant on that Sunday, appellant said "you could go ahead and keep him from this point." (Feb. 27, 2001 Tr. at 102.) Mr. Meade testified that appellant kept Cody during the workweek while he made babysitting arrangements. (Feb. 27, 2001 Tr. at 103.) Mr. Meade picked Cody up the following weekend and made arrangements to keep him for the whole week. Mr. Meade testified that appellant telephoned him to tell him to come and pick up Cody's belongings. (Feb. 27, 2001 Tr. at 104.)
Mr. Meade further testified that when he and Mrs. Meade arrived at appellant's home, and as he was loading items into the trunk of the car, appellant gave Mrs. Meade "a copy of his [Cody's] birth certificate, social security card. She [appellant] then gave us a letter for treatment until we could get, you know, what we had talked about the whole process of getting — making this a full-time, permanent placement." (Feb. 27, 2001 Tr. at 105.) Appellant testified that she gave the Meades a two-week supply of clothing, a dresser drawer, a bed and toys for Cody. (Feb. 21, 2001 Tr. at 49-50.)
A few days after her surgery, appellant contacted the Meades, requesting Cody be returned to her. Appellant testified that the Meades refused to return Cody to appellant, and further informed appellant that Arthur J. Sanders, FCCS caseworker, had given the Meades temporary custody of Cody. (Feb. 21, 2001 Tr. at 51.) Mr. Meade testified that a week after he met Cody, he contacted FCCS, and was referred to Mr. Sanders. (Feb. 27, 2001 Tr. at 107, 108.) Mr. Meade testified that he requested Mr. Sanders to conduct a home investigation. (Feb. 27, 2001 Tr. at 108.) Mr. Meade further testified that Mr. Sanders instructed Mr. Meade to care and provide for Cody. (Feb. 27, 2001 Tr. at 108.)
On August 23, 2000, the Meades filed a motion in the Franklin County Juvenile Court moving the court to exercise jurisdiction over the Meades as parties to the action, and to award them legal custody. Mr. Meade testified that he filed the motion because appellant said, "we need to get this done right away." (Feb. 27, 2001 Tr. at 109.)
On August 25, 2000, the Franklin County Juvenile Court recommended temporary order of custody granted to FCCS, with placement to the Meades. The trial court granted appellant visitation with Cody. On September 6, 2000, appellant filed a motion with the trial court requesting that Cody be placed back in her care. In her memorandum, appellant asserts that Cody reported to her that Mr. Meade was abusing him. On September 8, 2000, the magistrate ordered supervised visits with appellant at FCCS.
The matter was set for hearing before the trial court for annual review on the Meades' motion for modification of custody, and appellant's motion for alternative disposition. Sworn testimony was taken on February 21, 22, and 27, 2001. Appellant, the Meades, Guardian ad litem David L. Gibson, and appellee filed closing written arguments with the court. On April 10, 2001, the magistrate filed his findings of fact and conclusions of law. The magistrate found:
 The court finds the behavior of Ms. Ramey disturbing and completely unacceptable. For a caregiver to place a child with total strangers, with absolutely no information regarding them or their home, shows a lack of parenting skills, which make it impossible to trust the judgment of Ms. Ramey. Ms. Ramey would have the Court believe she only placed Cody with the Meades temporarily. However, she chose to send his bed, dresser, toys and most of his clothing for this temporary visit. The Court believes that clearly Ms. Ramey intended for this to be a long-term placement. Temporary or not, the Court finds her decision completely unacceptable. It should be noted that the Court finds it equally unacceptable that FCCS would allow the child to remain in the home once they discovered what had occurred without bringing the matter to the attention of the Court and the Guardian Ad Litem. It was, in fact, Ron and Dorothy Meade, who brought this to the attention of the Court.
 However, the credible testimony offered by all involved indicated that the home of Ron and Dorothy Meade is an appropriate placement for Cody. Even though Ms. Ramey and FCCS did little, if anything, to confirm the appropriateness of the home, luck was on the side of Cody. * * *
The magistrate granted legal custody to the Meades, denied appellant's motion for custody, terminated appellant's status as a party, and ordered no contact between appellant and Cody.
On April 24, 2001, appellant timely filed objections to the magistrate's decision, and requested an oral hearing. A hearing was scheduled for August 3, 2001. On July 25, 2001, appellant filed supplemental objections to the magistrate's decision. On August 3, 2001, the Meades filed a hearing brief in response to appellant's objections. The trial court heard the matter on August 3, 2001.
On October 9, 2001, the trial court held that, while the objections were timely, the trial court overruled appellant's objections to the magistrate's decision. The trial court thereby adopted and approved the magistrate's decision. It is from this decision that appellant appeals, assigning the following as error:
First assignment of error:
 The trial court erred in holding that a change of custody to Ronald and Dorothy Meade was in the best interest of the minor child, Cody Bradford, because the necessity for this change of custody was not proven by clear and convincing evidence, and the trial court's decision was against the manifest weight of the evidence.
Second assignment of error:
 The trial court erred in failing to conduct an interview of the child, Cody Bradford, to determine competence, after the child has been subpoenaed, and an in camera interview requested by Ms. Ramey.
Third assignment of error:
 The trial court erred in excluding child hearsay statements.
In her first assignment of error, appellant contends that the trial court abused its discretion in awarding custody to the Meades, and terminating her visitation rights.
A finding of dependency must be established by clear and convincing evidence. R.C. 2151.35(A). While the trial court must have based its decision on clear and convincing evidence, our standard of review in custody cases is an abuse of discretion. Pater v. Pater (1992),63 Ohio St.3d 393, 396. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. In Miller v. Miller (1988),37 Ohio St.3d 71, 74, the Ohio Supreme Court stated:
 * * * The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. * * * In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. * * *.
 Pursuant to R.C. 2151.353(A)(3), if a child is adjudicated abused, neglected, or dependent, the trial court, in its sound discretion, may award legal custody of the child to any parent or other person who files a motion requesting legal custody. In doing so, the court shall consider the best interest of the child. R.C. 2151.42(A); In the Matter of: Guedel S. (June 16, 2000), Lucas App. No. L-99-1343; In re Williams, Franklin App. No. 01AP-867, 2002-Ohio-2902, at ¶ 8.
 In this case, the Meades moved for legal custody on August 23, 2000. The magistrate conducted an annual review of this case, which lasted three days. On April 10, 2001, the trial court determined that it was in the best interest of Cody to award legal custody to the Meades. Appellant contends that appellee and the Meades failed to demonstrate that a change of custody and a total termination of her rights were in the best interest of Cody. Appellant contends that there was no evidence presented that she mistreated Cody, or had done anything inappropriate. Appellant reasoned that she needed assistance and therefore, called upon Mrs. Westfall to assist her in finding placement for Cody.
 Testifying on the behalf of appellant was Daniel Justin Mark Ramey, appellant's oldest son. Daniel testified that appellant never told him that she was trying to get Cody out of the house, or that she was trying to get Cody into another home. Daniel stated that appellant did not want to lose Cody, but wanted to adopt him. Daniel stated that he never saw any bruises or injuries on Cody as a result of the suspected abuse by appellant as alleged by FCCS in its initial complaint filed on September 30, 1999.
 Sharon Gautier,[3] a friend of appellant's, testified that she has never seen appellant use any form of physical discipline with Cody, and that Cody does not fear appellant, but he loves her. Sharon testified that, in her opinion, appellant is able to care for Cody.
 Appellant took the stand and admitted that she made arrangements for Cody to stay with virtual strangers. Appellant did not know the Meades' home address, but she had their home and cell telephone numbers. Appellant additionally admitted that she had no idea as to what the living conditions were at the Meades' home.
 Appellant testified that it was never her intention and she did not tell the Meades that she wanted them to take Cody. Appellant stated, "I considered it though. Because they asked me about a million times. But I never once told them yes, never. I told them I considered it." (Feb. 21, 2001 Tr. at 63.) Appellant further testified that she did not provide the Meades with Cody's clothing, any furniture, his social security card, his birth certificate, his shot records, and his school records. Appellant further stated that she never said that Cody was ugly, or called him a little bastard. Appellant testified that she is seeking to have Cody placed back in her home and she loves Cody as much as she loves her biological children.
 Mrs. Westfall testified on behalf of the state. Mrs. Westfall testified that appellant told her that Cody was getting on her nerves, that she was having a hard time bonding, and controlling Cody. Mrs. Westfall testified that appellant told her that Cody had problems with using the bathroom, and would smear his feces over the walls. Mrs. Westfall testified that appellant wanted her to take Cody into her home. Mrs. Westfall told appellant that she could not take Cody. Mrs. Westfall testified that appellant stated, "`I'm going to send the little bastard back because I can not handle him.'" (Feb. 21, 2001 Tr. at 102.) Mrs. Westfall has also heard appellant say, "'[d]on't you think he's [Cody] the ugliest thing you've ever seen.'" (Feb. 21, 2001 Tr. at 107.)
 Mrs. Westfall testified that she agreed to allow appellant, Peggy, and the Meades to meet at her home. Mrs. Westfall testified that appellant was trying to convince Peggy that placing Cody with the Meades was the right thing to do. Mrs. Westfall testified that, to the best of her knowledge, appellant was requesting permanent placement of Cody. Additionally, Mrs. Westfall observed bruises up and down Cody's spine, several black eyes, and handprints on his hand. Mrs. Westfall also observed Cody with a swollen, red ankle. Mrs. Westfall testified that appellant told her that Cody fell down the stairs. Mrs. Westfall testified that appellant wanted her to find Cody a good home. Mrs. Westfall testified that, since appellant could not care for Cody, appellant told her that she had to take him, or that he was going back.
 Mr. Sanders also testified on behalf of the state. Mr. Sanders testified that when the Meades contacted him, they were seeking long-term placement of Cody in their home. Mr. Sanders testified that for a six-week period, he allowed Cody to remain in the custody of the Meades. Mr. Sanders testified that appellant gave him the impression that she only wanted visitation with Cody, and for him to be permanently placed with the Meades.
 Mr. Sanders testified that he felt that Cody bonded with the Meades and that being in the Meades' home was "a positive situation for the child." (Feb. 22, 2001 Tr. at 31.) Mr. Sanders testified that, when he visited Cody in the Meades' home, Cody was happy, and interacted positively with the Meades. Mr. Sanders testified that his biggest concern with appellant is that she changed her mind on two separate occasions about keeping Cody. Mr. Sanders testified that he is concerned that appellant does not have the patience to care for Cody. Mr. Sanders, in his professional opinion, stated that Cody is better off placed permanently with the Meades.
 Julie Clevinger, Cody's pre-school special needs teacher, testified on behalf of the Meades. Clevinger stated that Cody was doing well, and appears to be happy. Clevinger stated that Cody does not exhibit any actions or behavior that would cause any concern in regards to his placement with the Meades. Clevinger further stated that Cody has met most of his goals, and that she would not see a problem with Cody entering into kindergarten the following school year.
 Ronald and Dorothy Meade both testified. Mr. Meade testified that Cody expressed that he does not want to go back home to live with appellant. Mr. Meade stated that he felt that appellant intimidated Cody, and that Cody is scared to go back home.
 Mrs. Meade testified that she met appellant for the first time on July 21, 2000, at a White Castle restaurant to make arrangements with appellant for Cody's first overnight stay. Mrs. Meade testified that appellant "asked me not to hate her for doing what she was doing basically and I told her I didn't and I — — that I actually respected her. She introduced Cody to me as his new mother — his new mommy." (Feb. 22, 2001 Tr. at 57.)
 Mrs. Meade testified that when she and Mr. Meade picked Cody up for another overnight stay, appellant gave them "his bed, his dresser, his toy box with toys in it, clothing, shoes, winter coat, copy of his — a copy of his birth certificate and social security card, copy of his shot records, his IEP from the school[.]" (Feb. 22, 2001 Tr. at 58-59.) Mrs. Meade testified that appellant never indicated to her that the arrangement with Cody was on a temporary basis while appellant recovered from surgery.
 Crystal Miller, neighbor and friend of the Meades, testified that when she first saw Cody, he appeared to be timid, malnourished, and withdrawn. Crystal testified that over the months, Cody appears to be much healthier, and enjoys interacting with her children.
 Based on the above testimony, we find that there was ample, competent, credible evidence before the trial court to support a finding by clear and convincing evidence that Cody should be adjudicated a dependent child. After a careful review of the record, we determine that the evidence supports the trial court's conclusion that the best interest of Cody is to award legal custody to the Meades under R.C. 2151.353(A)(3). As such, appellant's first assignment of error is not well-taken and is overruled.
 In her second assignment of error, appellant contends that the trial court failed to conduct an in camera interview of Cody, thereby prejudicing her case and depriving her of due process, and the right to call witnesses on her behalf. Appellant contends that the trial court should have conducted the interview to determine the competence of Cody to testify. Appellant contends that she wanted Cody to testify about wanting appellant to sneak him out of the Meades' home, and that Mr. Meade was abusing Cody.
 A review of the record supports the state's contention that appellant filed no objections from the magistrate's decision to deny an in camera interview with Cody. Therefore, pursuant to Juv.R. 40(E)(3)(b), appellant has waived this issue.
 Juv.R. 40(E)(3)(b) states in part that "[a] party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding or conclusion under this rule." We have consistently held that appellant's failure to file objections, in compliance with the rules, precludes appellant from appealing the issues decided in the magistrate's decision. In the Matter of Daniel, Franklin App. No. 01AP-313, 2002-Ohio-579; In the Matter of Hunter (Mar. 6, 2001), Franklin App. No. 00AP-507; In the Matter of Johnson (Dec. 12, 2000), Franklin App. No. 00AP-390; and In the Matter of Young (Dec. 21, 1999), Franklin App. No. 99AP-489. Thus, in the absence of objections, "no assignment of error can be made," and "[w]e can review the case only as the trial court reviewed, i.e., whether the magistrate's decision is factually erroneous." In the Matter of Hunter (Nov. 14, 2000), Franklin App. No. 00AP-421. See, also, In re Walker (Sept. 16, 1999), Franklin App. No. 98AP-1548 (where no objections are made, reviewing court's analysis is "limited to errors of law or other defects on the face of the magistrate's decision"). While Juv.R. 40(E)(4)(a) also provides that the trial court must undertake an independent examination of the magistrate's decision, even if no objections are filed, such analysis is limited to errors of law or other defects on the face of the magistrate's decision.
 In the instant case, appellant made an oral motion for an in camera interview of Cody. According to appellant, the purpose of the requested interview was to enable the trial court to clarify Cody's feelings. The trial court stated, "the child's under age where testimony wouldn't normally be allowed * * * we're talking about a kid here who's what five years old." (Feb. 21, 2001 Tr. at 5.)
 Because children's wishes are not controlling upon the trial court, but are only one among several factors a trial court considers when determining what is in the children's best interests, and in view of the tender age of Cody, the trial court's failure to interview him was harmless. R.C. 3109.04(F)(1)(a) through (j). Further, even assuming that appellant had filed objections to preserve her second assignment of error, we find no error by the trial court in affirming the magistrate's decision. Accordingly, appellant's second assignment of error is not well-taken and is overruled.
 In her third and final assignment of error, appellant argues that the trial court erred in excluding Cody's hearsay statements, particularly when the trial court denied appellant's oral motion for an in camera interview of Cody. Appellant argues that the excluded testimony was relevant to the Meades' motion for custody and appellant's motion for alternative disposition to remove Cody from the Meades' home because of alleged abuse.
 Appellant contends that the February 21, 22, and 27, 2001 hearings were dispositional, in whole or in part. As such, appellant contends that, under Juv.R. 34(B)(2), the trial court could have admitted hearsay evidence.
 Juv.R. 2(M) defines a dispositional hearing as "a hearing to determine what action shall be taken concerning a child who is within the jurisdiction of the court." Under this rule, the trial court is given latitude in admitting hearsay evidence during dispositional proceedings. Strict adherence to the rules of evidence is not required.
 Juv.R. 2(B) defines adjudicatory hearing as "a hearing to determine whether a child is a juvenile traffic offender, delinquent, unruly, abused, neglected, or dependent or otherwise within the jurisdiction of the court." Adjudicatory hearings include the determination of whether to grant a motion for permanent custody. Thus, the rules of evidence apply, and hearsay may not be admitted unless qualified under a hearsay exception. Juv.R. 34(I); In re Brofford (1992), 83 Ohio App.3d 869, 873; In the Matter of Davon B. (May 9, 1997), Lucas App. No. L-96-187. A child's hearsay statements regarding abuse may be admitted, but only if found to fit one of the hearsay exceptions or the trial court finds that it satisfies the requirements of R.C. 2151.35(F). Brofford, at 876. Furthermore, a trial court's reliance on inadmissible hearsay statements in determining permanent custody may be prejudicial. In the matter of Cody T. (Nov. 7, 1997), Lucas App. No. L-96-194; In the matter of Jessica Z. (Sept. 12, 1994), Sandusky App. No. S-93-52.
 In this case, the trial court did not abuse its discretion in excluding the hearsay statements. Appellant has failed to demonstrate prejudice from the exclusion of such testimony. The magistrate, after instructing the parties to submit written closing arguments stated, "to tell the truth, I don't believe that either of you are beating the child. I don't think the child's been beaten by anybody and I got a lot of testimony from both sides." (Feb. 27, 2001 Tr. at 160.) Accordingly, appellant's third assignment of error is not well-taken and is overruled.
 For the foregoing reasons, appellant's first, second, and third assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.
Judgment affirmed.
TYACK, P.J., and DESHLER, J., concur.
[1] Peggy has 13 children, many of which are in placement.
[2] Devon "Hunter" Bradford is also Peggy's biological child, and Cody's younger brother. Hunter resided with appellant since birth. Appellant later received legal custody of Hunter in Montgomery County, Dayton, Ohio.
[3] Cody's younger sister, Anna, and his older sister, Kristina, are living with Sharon. Sharon has legal custody of Anna, and a voluntary arrangement with Peggy to keep Kristina.